Carson, Appellant, *v.* Pittsburgh Coal Company.

Argued April 11, 1938.

Before KELLER, P. J., CUNNINGHAM,

Baldrige, Stadtfeld, Parker and Rhodes, JJ.

*Emanuel Goldberg,* for appellant.

*David C. Chaplin,* and *Rose & Eichenauer,* for appellee, were not heard.

Opinion by Cunningham, J., June 29, 1938:

In this case the compensation authorities set aside an award to an employee of the defendant company, for the loss of the use of his right leg, upon the ground it had been procured by fraud; the court below dismissed the claimant's exceptions and entered judgment for the defendant; this appeal, which we permitted the claimant to present in forma pauperis, is from that judgment.

While in the course of his employment on October 31, 1930, appellant suffered an accidental injury to his knee. On November 8, an open agreement was executed by the parties and later approved by the board. The accident was thus described in the agreement: "Bottom coal turned over and caught his leg," and the resulting injury as "sprain of right knee." It provided for payment of compensation for total disability at the rate of $14.42 per week for an indefinite period.

Appellant was discharged from the hospital on July 8, 1931, and on September 1st of that year executed a final receipt in which he acknowledged payment of

compensation, under the agreement, in the amount of $576.80. It was stated in the receipt that his disability terminated on August 15th.

On October 5, 1931, appellant filed with the board a petition for the review and modification of the agreement, under the second paragraph of Section 413 of the Workmen's Compensation Act of June 2, 1915, P. L. 736, as amended April 13, 1927, P. L. 186, 77 PS §772, upon the ground that he did not know he was signing a final receipt and was still totally disabled, his leg having been "broken and crushed." This petition was referred to a referee and a hearing had thereon on January 20, 1932. On April 8, 1932, the referee reported to the board that it had been "agreed by and between counsel for claimant and counsel for defendant that claimant has suffered the loss of his leg for all industrial purposes." Pursuant to this stipulation the final receipt was set aside and an award made, under section 306(c) of the statute, as amended April 13, 1927, P. L. 186, 77 PS §513, directing the employer to pay appellant $14.42 per week for a period of 215 weeks, beginning November 7, 1930, (the seventh day after the accident), subject to a credit for the amount of compensation paid under the agreement. As we understand the record, payments were also made, notwithstanding the receipt, from August 15, 1931, to March 31, 1932, to the amount of $473.80.

On July 12, 1932, the employer filed with the board its petition to terminate the agreement and supplemental award as of August 15, 1931, upon the ground that claimant had "established his claim to further compensation by fraud, improper conduct and misrepresentation." For the reasons stated in our opinion in the case of *Shay v. North Side Bank and Trust Company No. 1,* 132 Pa. Superior Ct. 53, 200 A. 308, this petition to terminate as of a date *prior* to the entering of the award was not an appro-

priate remedy, because section 413 provides for the modification or termination of an agreement or award only "as of a time *subsequent* to its date." The referee, after taking testimony on August 9, 10, and 11, 1932 so held and dismissed the petition on August 19th of that year. This error in procedure was immaterial, however, as the employer, on September 2, 1932, filed a petition under section 426, as amended April 13, 1927, P. L. 186, 77 PS §871, for a rehearing before the board, and also appealed to the board from the dismissal of its petition to terminate. This appeal may be disregarded as the board, on October 21, 1932, granted a rehearing and remanded the record to a referee.

In its petition for a rehearing, the employer averred, in effect, that it had discovered, subsequent to the making of the award of April 8, 1932, that the physical condition of appellant's knee, upon which the award for the loss of a leg had been based, was not due to any injuries received by him in the accident of October 31, 1930, but had been caused by "premeditated, willful, self-inflicted, injuries and mutilations" inflicted by appellant on different occasions during the time his petition for additional compensation was pending before the referee. It was further set forth that the employer had been fraudulently induced to agree to the awarding of compensation for the loss of appellant's leg by the fraud, improper conduct and misrepresentation, of appellant.

The referee, upon the basis of the testimony taken at the various hearings in 1932, made findings of fact on October 4, 1933, reciting the previous history of the case and including the following: "Much lay testimony was taken in this case. After observing the character, demeanor and the general conduct of the several witnesses as they testified, your referee finds that the claimant tied a rope around his right leg below the knee and beat the knee with a hammer on several occasions before he

reported for medical examination, and that he followed this practice for the purpose of deceiving the doctors as to his true physical condition, and further that as a result of these acts the claimant so misled the defendant's doctors that they recommended that the defendant agree to the award made by referee Lewis on April 8, 1932."

The second conclusion of law of the referee reads: "Since the claimant secured the award by fraud and misrepresentation, the defendant is entitled to have the same set aside as prayed for, and the agreement terminated as of August 15, 1931." A formal order to this effect was entered. Appellant appealed to the board from these findings. As a result of certain proceedings instituted for the purpose of correcting several alleged errors in the transcript of the testimony, the referee made a further report in the course of which he reiterated that appellant had, by inflicting injuries upon himself, misled the medical advisers of the coal company into advising a settlement upon the basis of the loss of the use of the leg. An excerpt from this report reads: "There was no question in the mind of your referee that this was completely and thoroughly established, and even though the claimant might have had some disability before he committed the acts by which he was able to deceive the doctors, it was of such a nature that it was impossible to separate the effects of the injury from the effects of his own self-inflicted damage, and as a result of that, your referee found that he secured his agreement and award by fraud and still believes that such findings should be sustained." On September 20, 1934, the board filed an opinion adopting the findings of fact and conclusions of law of the referee.

An examination of the testimony of the witnesses, called by the employer in support of its charges against appellant, discloses ample, competent, evidence sustaining the findings of the compensation authorities. For

instance, Stanley Croll and his wife, with whom appellant boarded after being discharged from the hospital and while his petition for additional compensation was pending before the referee, testified to various acts and declarations on the part of appellant indicative of his deliberate intent to deceive the physicians and the referee. It is contended on behalf of appellant that their testimony should not be believed because a controversy had arisen over the payment of appellant's bill for boarding. Their credibility was for the fact-finding body and there was ample corroborating evidence from apparently disinterested witnesses. An excerpt from Mrs. Croll's testimony reads: "Q. Did he tell you at different times when he was going to the hospital for examination? A. Yes, he often told me he was. When he came to stay with me he told me he was hurt and I asked how he was and he said he was hurt in the coal mine. He said it wasn't so bad, he made it worse. Q. Did he tell you how he made it worse? A. Yes, said he got stuff out of the drug store to make his leg sore, the knee. Q. Did he tell you how he made his knee sore? A. He said he had medicine on his knee. Q. Did he tell you at any time that you had to be smart to put it over on the compensation men? A. Yes, he said he didn't believe in working hard. He said he would like to get easy money. He said American people are dumb, it takes foreigner to be wise and get easy money."

Her husband testified: "Q. Did you ever see Benny Carson have a rope or tie a rope around his knee or leg? A. Yes. Q. Where did you see him? A. Sitting on a chair inside in my kitchen. Q. Did you ever see him hit his knee with a hammer? A. Yes. Q. Where was that? A. All around here (indicating around the knee cap). Q. Did you say anything to him when you saw him hit his knee with a hammer? A. I told him 'Benny what for you do that.' He says you have to be smart then you get money. Coal money. I didn't need to

work for anything. Q. What did he say ...... did he say anything to you about making his knee sore? A. He told me going to doctor show his legs pretty bad." The witness produced the hammer at the hearing.

Robert Miller, a companion of appellant, after testifying that pursuant to a previous arrangement he went to appellant's boarding house one morning continued: "When I came there, I woke him up and when he got up, he had a rope tied it up here and here (indicating above and below the knee) and it was swelled up and then I asked him why he do that and he told me, just come down here and collect money that is the only way he could get it. Otherwise, he couldn't get it. That's all I know about that. Q. You say ...... what did he say about having that ...... he had to do that, why did he do that? A. He said just done that to make easy money that is what he told me. He show witness and show doctor. That is what he told me."

Dr. Grover C. Weil, who had charge of appellant in the hospital, and to whom appellant reported from time to time for examination, testified he suspected, but had no way of proving, that some of appellant's injuries were "self-induced" and that he was "malingering."

Dr. E. W. Fisk, an orthopedic surgeon called by appellant, testified he examined appellant at St. Margaret's Hospital, from March 7 to 9, 1933. His testimony by no means supports the contention that appellant had lost the use of his leg, within the meaning of section 306(c) of the statute. (Compare opinion this day filed in *Conley v. Allegheny County*, 131 Pa. Superior Ct. 236, 200 A. 287.) The effect of his testimony was that appellant merely had a certain amount of permanent weakness in his knee joint in the nature of a chronic sprain.

We are not impressed with the argument on behalf of appellant that the evidence of the imposition prac-

ticed by appellant was not after-discovered within the scope of the decisions, because it might have been obtained by reasonable diligence prior to the hearing in January, 1932. There is nothing on the record to indicate that the representatives of the employer had any definite clues which they neglected to investigate. It is true that the attending physicians at the hospital reported they suspected appellant was "malingering," but they had nothing more than a mere suspicion. It would be unreasonable to conclude that counsel for the employer failed to present at the hearing any tangible evidence within their knowledge which would tend to rebut the contention of appellant that he had lost the use of his leg as a result of the accident.

We think the record warrants the conclusion that the evidence was discovered subsequent to the hearing in January, 1932, and that its effect was not merely corroborative, but, if believed, constituted a complete defense against appellant's contention and justified the setting aside of the award.

Judgment affirmed.